AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE CELLULAR TELEPHONE ASSIGNED CALL<br>NUMBER 207-289-4608 | )<br>)<br>)<br>)<br>)<br>)    Case No.    **3:17 mj 319** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 846 | conspiracy to distribute controlled substances |
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit of Robert Buzzard

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Buzzard, SA of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-12-17

_____
*Judge's signature*

City and state: Dayton, Ohio    Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE
ASSIGNED CALL NUMBER **207-289-4608**

Case No. _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Robert M. Buzzard, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **207-289-4608, (the "Target Cellular Device")**, whose service provider is **Sprint**, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251. The Target Cellular Device is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 27, 2002. I have been involved in narcotics related arrests; the execution of search warrants, which resulted in the seizure of narcotics; and supervised the activities of informants who provided information and assistance resulting in drug buys. Since 2002, I have received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug

proceeds, and the organization of drug conspiracies. In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and nontelephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls or text messages from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. I have also encountered the practice of traffickers fielding calls from drug customers and directing those customers to "drug houses" which are used to store, package, and sell narcotics.

3.     Your Affiant also knows through training and experience that drug traffickers are oftentimes "fronted" narcotics from their supplier. Once the drug trafficker sells the narcotics, he/she is expected to pay their supplier for the "fronted" narcotics.

4.     The facts in this affidavit come from my personal observations, my training and experience and information obtained from other FBI Special Agents/Task Force Officers in the

2

Northern District of Ohio. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Kelvin Bedell, an unknown person (U.P.) utilizing the Target Cellular Device, and others unknown.   There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

### PROBABLE CAUSE

6.     The Cleveland FBI and members of the Northern Ohio Law Enforcement Task Force (NOLETF) have been investigating the drug trafficking activities of the Khalilah Crumpler, aka Baldy, Drug Trafficking Organization (DTO) since April 2014.   During this investigation, members of NOLETF learned through court-authorized Title III wiretap intercepts, confidential reliable sources, GPS tracking of vehicles and telephones, and physical surveillance that Khalilah Crumpler, aka Baldy, Tajuan Bradberry, aka Bug, Kevin Philmon, aka Big Kev, and Wayne Nix, run a sophisticated drug trafficking operation which transports kilogram quantities of cocaine and/or heroin from the Los Angeles, California, area to the Cleveland, Ohio, area.   On April 19, 2016, Christopher Fitzgerald, Chiquita Anderson, and Rashard Smith were charged as part of this investigation in the United States District Court, Northern District of Ohio, Eastern Division in a nine-count indictment with charges including but not limited to Conspiracy to Possess with Intent to Distribute Cocaine.   On March 7, 2017, a jury returned guilty verdicts against all defendants following trial.

7.      On April 14, 2015, members of NOLETF interviewed Confidential Source (CS#1). CS#1 stated he/she began trafficking heroin and cocaine in 2014. Sometime in 2014 or early 2015, CS#1 stated he supplied Tajuan Bradberry with amounts of heroin. CS#1 stated in that same time frame he/she also received kilogram quantities of cocaine from Khalilah Crumpler. CS#1's basis of knowledge of the Crumpler DTO is from CS#1's involvement as a member of the DTO.[1]

8.      On May 5, 2016, an investigator from NOLETF received information from CS#1. CS#1 stated that CS#1 was aware that federal agents executed a search warrant at Roland Smith's residence near Cleveland's Fourth District, wherein a seizure of heroin and a firearm were recovered. CS#1 stated that he/she believes that the seized heroin recovered by investigators was supplied to Roland Smith by Khalilah Crumpler either directly or through another member of her DTO. CS#1 stated that Khalilah Crumpler lives in Rancho Cucamonga, California; however, she frequently travels to Cleveland, Ohio, on behalf of her DTO. CS#1 identified Tajuan Bradberry (Crumpler's brother) as a pivotal part of this DTO. CS#1 stated that once the kilogram quantities of cocaine and heroin arrive in the Cleveland, Ohio, area, Tajuan Bradberry is responsible for the distribution throughout the Northern District of Ohio. CS#1 advised that the kilogram quantities of cocaine and heroin are transported into the Northern District of Ohio via commercial freight and off-loaded at an unknown warehouse. CS#1 believed that a shipment of drugs was soon to

---

1 CS#1 provided information to the FBI for approximately two years. CS#1 has received consideration for a criminal charge in return for information regarding drug trafficking activity. Additionally, CS#1 has been paid in the past for providing information and assisting law enforcement in active investigations. CS#1 has provided information to law enforcement concerning activities of multiple drug trafficking organizations in the Cleveland, Ohio, area. CS#1 has conducted controlled purchases on behalf of law enforcement and made consensually recorded telephone calls. CS#1 has consistently provided timely and accurate criminal intelligence, and has never provided information that was later proven to be false or misleading. For these reasons, your Affiant believes that CS#1's information is reliable.

arrive in Cleveland. CS#1 had recently seen Tajuan Bradberry in possession of five (5) cellular telephones.

9.     On June 28, 2016, a member of NOLETF received information from CS#1. CS#1 stated that he/she heard through various sources that Tajuan Bradberry received a shipment of cocaine and heroin the past weekend. CS#1 advised that the kilogram quantities had already been disseminated to members of Khalilah Crumpler's DTO throughout the Northern District of Ohio. CS#1 believed that the shipment was off-loaded at a warehouse on St. Clair Avenue.

10.    On June 28, 2016, another member of NOLETF received information from CS#2. CS#2[2] provided a current telephone number for Tajuan Bradberry. A member of NOLETF conducted an FBI computerized check of the telephone number for Bradberry. A member of NOLETF found Bradberry's cellular telephone number to have been in contact with telephone number (216) 965-4407, known to be used by Khalilah Crumpler, on July 24 and 26, 2016.

11.    On August 5, 2016, Magistrate Judge Kenneth S. McHargh, United States District Court, Northern District of Ohio, Eastern Division, entered an Order authorizing the acquisition of precise location data from Bradberry's cellular telephone. On August 8, 2016, members of NOLETF began receiving precise location data for Bradberry's cellular telephone.

---

2 CS#2 has been providing information to the FBI since August, 2003. CS#2 is currently receiving monetary compensation for providing information regarding illegal activity. CS#2 has no criminal history. CS#2 has provided information to law enforcement concerning activities of multiple drug trafficking organizations in the Cleveland, Ohio, area. On numerous occasions, CS#2's information has led to the convictions of drug traffickers and their key associates. Since 2003, CS#2 has routinely provided information which led to the identification and conviction of violent criminals. CS#2 has also assisted local law enforcement with the identification and conviction of persons involved in three homicides. CS#2 has consistently provided timely and accurate criminal intelligence and has never provided information that was later proven to be false or misleading. For these reasons, your Affiant believes that CS#2's information is reliable.

12.     Since August 8, 2016, a member of NOLETF learned from precise location data along with computerized checks that Bradberry was living in California. On September 9, 2016, a member of NOLETF received information from CS#1 that Bradberry had traveled from California to the Cleveland, Ohio area. Members of NOLETF were able to confirm through precise location data that on Thursday September 8, 2016, Bradberry's cellular telephone traveled from the LA/Ontario Airport in California to the Dallas Fort Worth Airport. On September 9, 2016, Bradberry's cellular telephone traveled from the Dallas Fort Worth Airport to Cleveland Hopkins Airport. Based on precise location, members of NOELTF were aware that data that Bradberry's cellular telephone remained in the Cleveland, Ohio, area until September 12, 2016. On September 16, 2016, precise location data showed Bradberry's cellular telephone leave Cleveland Hopkins Airport and travel to Denver International Airport. Precise location data then showed Bradberry's cellular telephone travel from Denver International Airport back to LA/Ontario Airport.

13.     On September 14, 2016, member of NOLETF received information from CS#1. CS#1 stated that on September 11, 2016, Raymond Newton, who CS#1 identified as a member of the Bradberry/Crumpler DTO, had been arrested at his residence in the Warrensville Heights, Ohio area with a large amount of cocaine and a gun. CS#1 stated this cocaine was supplied to the arrested male by Wayne Nix, who got it from Tajuan Bradberry. CS#1 based this belief on CS#1's knowledge of the DTO.

14.     On September 15, 2016, members of NOLETF confirmed that Raymond Newton was arrested on September 11, 2016, at 19415 Longbrook Road, Warrensville Heights, Ohio, with in excess of a kilogram of cocaine and a handgun as CS#1 had described. Based on this information, combined with location information from Bradberry's cellular telephone indicating

6

that Tajuan Bradberry was in the Northern District of Ohio, your Affiant believes that this cocaine came from the Bradberry/Crumpler DTO.

15.     In August 2016, CS#1 identified Wayne Nix and Kevin Philmon, as members of the Crumpler/Bradberry DTO, which is operating on the east side of Cleveland, Ohio. CS#1 stated that Nix and Philmon are very close drug associates and often hang out together at Cleveland area bars, specifically, Rumors Bar & Lounge, 1266 West 6th Street, Cleveland, Ohio 44113.

16.     On September 21, 2016, members of NOLETF conducted a proffer interview of Raymond Newton. Newton stated the cocaine that law enforcement seized from his residence on September 11, 2016, came from a black male known to him as "Big Kev" known to law enforcement as Kevin Philmon.[3]

17.     Newton stated Kevin Philmon is from the Kinsman Road, and East 116th Street neighborhood in Cleveland, Ohio. Newton stated he met Philmon a few years ago at Rumors Bar on West 6th Street, Cleveland, Ohio.

18.     Newton stated that the weekend he was arrested, he was at Rumors Bar and saw Kevin Philmon. Newton stated he asked Philmon if he could purchase cocaine from him (Philmon). Newton stated Philmon took him outside and gave him an Android minute phone which Philmon had retrieved from inside a silver Chevrolet Traverse. Newton stated he believed

---

3 On September 30, 2016, investigators met with CS#1. CS#1 stated that CS#1 knew "Big Kev" but did not know his real name. CS#1 identified "Big Kev's" mother's house as 3211 East 117th St., Cleveland, Ohio. A computerized record search through OHLEG utilizing 3211 East 117th Street, Cleveland, Ohio, identified Edna Harris, residing in the upstairs unit and Fay Philmon, residing in the downstairs unit, Kevin Philmon was also associated with Fay Philmon and the downstairs unit from the records search. A computerized name search through OHLEG utilizing the name Kevin PHILMON identified Kevin D. Philmon, DOB 8/7/1982. A photo of Kevin D. Philmon was generated and shown to CI#1, who made a positive identification that Philmon was "Big Kev."

the Traverse was a rental vehicle. Newton stated Philmon told him he would get in touch with Newton on the telephone he provided.

19.     Newton stated on September 10, 2016, Kevin Philmon contacted him on the Android cellular telephone. Newton stated at around 5:30 p.m., on the same date, Philmon arrived at his residence to sell him cocaine. Newton stated he purchased a kilogram of cocaine for $35,000 from Philmon in the kitchen of his residence. Newton stated Philmon was driving the same silver Chevrolet Traverse rental vehicle. Newton stated the kilogram of cocaine was already "broken down" into the baggies as was when it was seized by law enforcement.[4] Newton also stated he paid for the cocaine provided by Philmon with $35,000 from past drug proceeds. Newton stated that this was the first time Newton purchased cocaine from Philmon.

20.     Newton stated the Android cellular telephone phone that was provided to him by Kevin Philmon was on top of the dresser where law enforcement seized the Kyocera flip phone and U.S. currency on September 11, 2016. Newton stated when he arrived home from jail; he found the back door of his house kicked in and the phones gone. Newton assumed law enforcement seized both phones.

21.     Newton stated the Kyocera flip phone seized by law enforcement was his "dope phone" which he used to sell his cocaine. Newton stated he mainly sold grams of powder cocaine. Newton stated he sold the cocaine for $50 a gram. Newton signed a consent to search form and an investigator and Newton went through the Kyocera flip phone. Newton stated he did not know what happened to the Android cellular telephone that Kevin Philmon provided to him.

_____

4 The cocaine was bagged in smaller distribution quantities.

Investigators had seized a black Kyocera flip phone (telephone number 216-855-5780) and an Apple iPhone (telephone number 216-548-1565) from Newton's residence the night of the crime.[5]

22.     When investigators searched Newton's Kyocera telephone, neither Wayne Nix's, nor Kevin Philmon's telephone numbers were present in the telephone. Newton's I-Phone was returned to him before the proffer date, and investigators did not have opportunity to get consent from Newton to search the iPhone. In addition, WHPD did not seize an Android phone, specifically the Android phone Newton stated Philmon had provided Newton prior to Newton's arrest.

23.     Investigators believe Newton minimized and withheld information during his proffer session. Investigators also believe the Android phone Newton stated Kevin Philmon provided him does not exist or Newton was not forthcoming about the telephone's actual location to protect others involved in drug trafficking, specifically Wayne Nix because, based on CS#1's information, your Affiant believes Nix is Newton's main drug supplier.

24.     On October 4, 2016, United States Magistrate Judge David Ruiz, Northern District of Ohio, signed an order authorizing the use of a pen register and trap and trace and the acquisition of cell-site data on the cellular telephone number (216)246-3112, known to be used and possessed by Wayne Nix.[6] This pen register and trap and trace became operational on October 4, 2016, and continues through the present. Investigators also subpoenaed telephone records for Nix's cellular telephone from August 4, 2016, through October 3, 2016.

---

5 During the proffer session with investigators, Newton provided telephone number 216-548-1565 as the number for his Apple iPhone.

6 CS#1 provided a member of NOLETF with Wayne Nix's cellular telephone number. Subpoenaed information also listed Nix as the subscriber to the telephone number provided by CS#1.

25.     Telephone records from August 4, 2016, through November 9, 2016, show cellular telephone number (216) 246-3112, known to be used and possessed by Wayne Nix and Newton's cellular telephone (216-548-1565) in telephonic communication 164 times.  Specifically, on September 9 and September 11, 2016, Wayne Nix and Newton were in contact prior to Newton's arrest and the seizure of the cocaine.

26.     Newton bonded out of jail within days after his arrest.  Telephone communications resumed between Newton (216-548-1565) and cellular telephone number (216) 246-3112 known to be used and possessed by Wayne Nix on September 16, 2016, and have continued through June 24, 2017.

27.     Investigators believe these telephone communications reiterate investigators' belief Newton minimized during his proffer session about his source of supply.  Additionally, Newton claimed to not know the identity of "Big Kev" even though they were in frequent telephonic contact and a "dope" phone was not discovered by officers during the search of Newton's residence.

28.     On November 4, 2016, a member of NOLETF conducted a telephone analysis of pen register data of cellular telephone number (216) 246-3112 known to be used and possessed by Wayne Nix.  A member of NOLETF found that between October 18, 2016, and October 31, 2016, this cellular telephone was in communication eleven (11) times with telephone number (216) 401-0359, possessed and used by a currently unknown person.  A member of NOLETF also found that in June 2016, that telephone number (216) 401-0359, was in communication (toll records) one (1) time with telephone number (213) 332-9925.  Telephone number (213) 332-9925 is known to be possessed and used by Tajuan Bradberry, aka Bug.

29.    On January 3, 2017, members of NOLETF received information from NOLETF Confidential Source #3.[7] Investigators learned from CS#3 that beginning in 2003; he/she was obtaining quantities of cocaine from Wayne Nix. During this time frame, CS#3 had firsthand knowledge that Dewitt Chisholm was also being supplied cocaine by Nix. In 2011, CS#3 and Nix had a falling out, at which time Nix stopped supplying CS#3 with drugs. From 2011 to present, CS#3 knew that if he/she needed a supply of cocaine, that he/she could obtain it from Chisholm. CS#3 provided investigators with cellular telephone number (216)385-6379, which is known to be used and possessed by Chisholm.

30.    On May 2, 2017, Judge James S. Gwin, United States District Court, Northern District of Ohio, entered an Order authorizing the interception of wire and electronic communications, including but not limited to text messages, to and from cellular telephone number (216) 385-6379, service provided by Verizon Wireless, subscribed to Dewitt Chisholm, 23801 Banburry Circle, Unit 3-G, Warrensville Heights, Ohio 44128, known to be used by Dewitt Chisholm, and wire communications, to and from cellular telephone number (216) 704-9288, service provided by AT&T, subscribed to Dewitt Chisholm, 14011 Bartlett Avenue #3G, Cleveland, Ohio 44120, known to be used by Dewitt Chisholm. The interception of these facilities commenced on May 3, 2017, and ceased at 11:59 p.m., on May 22, 2017.

---

7 CS#3 began providing information to NOLETF investigators in February, 2015. CS#3 is currently providing NOLETF information regarding the Wayne Nix DTO (Drug Trafficking Organization) in exchange for monetary compensation. CS#3 has convictions for: Drug Abuse (1983); Drug Possession (1991); Drug Abuse (1993); Carrying a Concealed Weapon And Trafficking In Drugs (1993); Assault and Vandalism (1997); Possession of Drugs (1999); Possession of Drugs (1999)x2; Possession of Drugs (2000); Possession of Drugs, Resisting Arrest, and Tampering with Evidence (2005); Possession of Drugs (2011); Trafficking in Drugs and Prohibition of Conveyance of Certain Items (2011); and Trafficking in Drugs and Tampering with Evidence (2011).

31.     On May 22, 2017, Judge James Gwin, United States District Court, Northern District of Ohio signed an Order to acquire precise cellular telephone location data for cellular telephone number (216) 246-3112,[8] known to be possessed and used by Wayne Nix.

32.     On May 24, 2017, Judge James Gwin, United States District Court, Northern District of Ohio, entered an Order authorizing the interception of wire communications to and from telephone number (216) 246-3112, service provided by AT&T, subscribed to Wayne Nix, 25901 Columbus Road, Bedford, Ohio, known to be possessed and used by Wayne Nix . The interception of this telephone commenced on May 24 2017, and expired on June 21, 2017.

33.     On June 22, 2017, Judge James Gwin, United States District Court, Northern District of Ohio, entered an Order authorizing the continued interception of wire communications and the initiation of interception of electronic communications to and from telephone number (216) 246-3112, and the initiation of wire communications to and from telephone number (216) 738-6786[9], service provided by Sprint, subscribed to Jay Jones, PO Box 15955, Lenexa, Kansas.  Both telephones are known to be possessed and used by Wayne Nix.  The interception of these telephones commenced on June 22, 2017, and is ongoing and is set to expire on July 21, 2017.

34.     Through the interception of wire communications, members of NOLETF confirmed that Nix, and others run a DTO responsible for distributing large quantities of heroin, cocaine, cocaine base/crack, and marijuana throughout the greater Cleveland, Ohio, area.  This monitoring has resulted in the interception of conversations in which Nix spoke to his drug

---

8    During the Title III wiretap investigation of Dewitt Chisholm, investigators confirmed through intercepted telephone conversations and electronic surveillance that Wayne Nix is supplying Dewitt Chisholm with cocaine and/or heroin.

9    Interception of electronic communications was not authorized.

12

customers and drug suppliers to arrange meetings and distribute quantities of drugs and/or to collect monies from his customers. This investigation, included the interception of wire communications between (216) 246-3112, known to be used and possessed by Wayne Nix, and (216) 882-8645, (216) 313-5068, (216) 548-7235, (216) 559-9963, (216) 632-5221, known to be possessed and used by Kelvin Bedell, to conduct drug activity.

35.     Selected conversations set forth below pertain to Kelvin Bedell's use of telephone numbers (216) 882-8645, which were intercepted pursuant to Title III wiretaps of telephone number (216) 246-3112 (TT-3), known to be used and possessed by Wayne Nix. From a review of intercepted conversations, the participants involved in those conversations, surveillance, electronic surveillance, information developed during this investigation, confidential reliable source information, witness interviews, and from your Affiant's training and experience, members of NOELTF has made certain interpretations regarding the words and phrases used by speakers in the intercepted conversations. These interpretations will be indicated by parentheses or otherwise noted.

36.     On May 21, 2017, Maple Heights Police Department responded to 5207 Henry Street, Maple Heights, Ohio, for a domestic violence incident.[10] Upon arrival, officers were met by Kelvin Bedell and his live-in girlfriend, Alicia Allen. The investigation revealed that Bedell punched Alicia Allen several times in the head, and rib area, causing her to fall to the ground. While on the ground, Bedell repeatedly kicked Alicia Allen in the legs and back, while she was holding their three (3) year old son. The injuries sustained by Alicia Allen supported her statement.

_____

10 On May 26, 2017, members of NOLETF learned of Kelvin Bedell's arrest through wire interceptions on TT-3. Investigators did a database search, which confirmed that Bedell was arrested on May 21, 2017, by the Maple Heights Police Department. Investigators contacted Maple Heights Police and received an incident report documenting the details of Bedell's arrest, as stated herein.

Subsequently, Bedell was arrested for Domestic Violence and Child Endangering. During a search of Bedell's person, incident to arrest, officers recovered a clear plastic bag in his (Bedell) left front pants pocket, which contained a white substance. This substance had a gross weight of 29.1 grams and field-tested positive for cocaine. Bedell also possessed $801 dollars in various denominations and a cellular telephone (216-313-5068[11]). Bedell was transported to Maple Heights Police Department and booked into jail. On this same date at approximately 3:50 p.m., Maple Heights Police were summoned back to 5207 Henry Street on complaint of more drugs (cocaine) being discovered in the basement. Responding officers were met by Alicia Allen and escorted to the basement, where Alicia Allen identified a single tennis shoe belonging to Bedell that contained a clear plastic bag containing a white substance. Officers took custody and control of the white powder, which had a gross weight of 28.9 grams and field-tested positive for cocaine. The cocaine seized during this investigation will be submitted to the crime laboratory for further analysis.

37.     On May 22, 2017, criminal complaints were filed against Bedell in Garfield Heights Municipal Court, where a $20,000 dollar bond was set. On May 23, 2017, the case against Bedell was transferred to the Cuyahoga County Grand Jury for indictment, which occurred on June 2, 2017. On May 23, 2017, Kelvin Bedell's bond was posted and he (Bedell) was released from jail.

38.     On May 24, 2017, at approximately 9:38 p.m., an outgoing telephone call was placed from TT-3, to telephone number (216) 882-8645, wherein Wayne Nix had a conversation with Kelvin Bedell[12]. After the initial greeting, Nix replied, "I'm about to pull up to the house. I

_____

11 Maple Heights Police Department Detective Bureau has obtained a search warrant to examine the contents of the seized cellular telephone possessed by Kelvin Bedell and has submitted the phone for forensic testing.

12 Bedell was identified based on voice recognition.

ain't been there all day. I've been riding around the neighborhood all day and shit." At approximately 9:42 p.m., surveillance video from Nix's residence showed Nix arriving at 24660 Berrimore Lane in his rented blue 2017, GMC Acadia. Bedell responded, "Shit, I may have to sleep on your couch tonight. I'll probably bring that to you tomorrow, too (money)." The conversation continued, and Bedell and Nix talked about the domestic issue that Bedell was currently having with his girlfriend. Additionally, Nix and Bedell talked about money that Bedell was missing as a result of his (Bedell) recent arrest. Nix stated that he believed that Bedell's girlfriend (Alicia Allen) stole a portion of the money. The conversation continued as Nix stated, "Did that girl (Alicia Allen) give you the money?" Bedell replied, "Nope." Nix stated, "Man, she got that money, man." Bedell replied, "Yeah, I believe she do, too." Nix stated, "Man, she got it (money), man, I done thought about it. I done sat back and thought about it, man, and, like, man, the girl, she lying about everything and she deceitful and shit. You know what I'm saying? Like her word and shit, you feel me?" Bedell replied, "Yeah. Man, she ain't even called, her answering machine, man, she ain't even called me." Nix responded, "Yeah, and, and, and, any other time she calling you every two minutes." Bedell replied, "Yep, she done it (stole Bedell's money)." Nix stated, "She got that bread (money), man, I'm telling you, I know it is over, man, she trying to get something to hold onto, for real." Bedell replied, "It's going to cost her though. Maybe I tear up her car up and she going to be paying five hundred each." Nix responded, "Yeah, and set that bitch (car) on fire." Bedell replied, "Naw, the insurance will take care, I got to get her on the deductibles." Nix responded, "Yeah, yeah, yeah, all the windows (break all the windows)." Bedell replied, "Yep, collapse (break) some windows every chance I get, sugar in her tank, put the GPS under her motherfucking ass." Nix responded, "Man." Bedell replied, "Take a look at her, that bitch got me hot, I ain't even going to lie. You said in the morning though, it's on." Nix responded,

15

"Definitely!" Bedell replied, "I'll call you." Bedell replied, "Man, I need you to be there, then I need somewhere to crash." Nix responded, "You can." Bedell replied, "'Cause my PO (Parole Officer) said I can't go over there (5207 Henry Street, Maple Hts.)." Nix responded, "Hell naw, I wouldn't man, 'cause this, this the thing. For real, your mamma (Rhonda Johnson) can kick her (Allen) out, for real." Bedell replied, "Yeah, but I don't want her (Allen) to just, you know what I'm saying?" Nix responded, "Yeah." Bedell replied, "I need her to, but I need her to take, to get this shit up off of me first (get the domestic violence charges dropped)."

39.     On May 24, 2017, at approximately 10:41 p.m., investigators reviewed surveillance video, which depicted a maroon Cadillac CTS crossover arriving at 24660 Berrimore Lane, Warrensville Heights, Ohio. Based on physical characteristics, investigators believe the driver was Kelvin Bedell. He exited the vehicle and was let into the front door of the residence.

40.     On June 27, 2017, the United States Marshals arrested Kelvin Bedell pursuant to a federal probation violation warrant at 23351 Chagrin Blvd., Apt N-404, Beachwood, Ohio.  During the arrest, Bedell gave Marshals consent to search his apartment and agents seized $32,507 and three cell phones a Samsung S8+, One black ZTE cellular telephone, model number Z223; IMEI: 868899020226193 S/N:  3217600065338, and One black ZTE cellular telephone, model number Z223; IMEI:  868899027010830 S/N:  325164281300.

41.     On June 27, 2017, United States Magistrate Judge William H. Baughman, Northern District of Ohio, signed a search warrant authorizing the forensic examination of one black ZTE cellular telephone, model number Z223; IMEI: 868899020226193 S/N:  3217600065338, and one black ZTE cellular telephone, model number Z223; IMEI:  868899027010830 S/N: 325164281300, both of which were seized from Bedell earlier in the day as described in paragraph 40.

16

42. On June 27, 2017, NOLETF TFO Ryan Allen completed a forensic examination of one black ZTE cellular telephone, model number Z223; IMEI: 868899020226193 S/N: 3217600065338, and one black ZTE cellular telephone, model number Z223; IMEI: 868899027010830 S/N: 325164281300.

43. On June 28, 2017, members of NOLETF reviewed the forensic data seized pursuant to a search warrant as described in paragraphs 42 and 43. Members of NOLETF found the black ZTE cellular telephone, model number Z223; IMEI: 868899020226193 S/N: 3217600065338, to have cellular telephone number (216) 534-9656 and the black ZTE cellular telephone, model number Z223; IMEI: 868899027010830 S/N: 325164281300, to have cellular telephone number (216) 548-7235.

44. Members of NOLETF reviewed the text messages for telephone number (216) 548-7235, which revealed numerous incoming and outgoing text messages to the **Target Cellular Device** between May 27, 2017 and June 26, 2017.

45. A sample (not all text messages were included) of the selected text messages set forth below pertain to Kelvin Bedell's use of telephone numbers (216) 548-7235, and the U.P. utilizing the **Target Cellular Device**. From a review of text message conversations, the participants involved, surveillance, electronic surveillance, information developed during this investigation, confidential reliable source information, witness interviews, and from your Affiant's training and experience, members of NOELTF have made certain interpretations regarding the words and phrases used by speakers in the intercepted conversations. These interpretations will be indicated by parentheses or otherwise noted.

17

46.     On May 27, 2017, at approximately 7:20 p.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "He probably give you some bricks (kilograms of cocaine) for it (kilogram of heroin)."

47.     On May 27, 2017, at approximately 7:21 p.m., the **Target Cellular Device**, received a text message from telephone number (216) 548-7235, which read, "Ok cool."

48.     On May 27, 2017, at approximately 9:00 p.m., the **Target Cellular Device**, received a text message from telephone number (216) 548-7235, which read, "Youll send 2 or 2 and a half (kilograms of heroin) and we pay the difference."

49.     On May 28, 2017, at approximately 11:00 a.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "Im about to get back out the bed and see I have out testers (heroin users) yesterday and see if its (heroin) worth dealing (purchasing) with."

50.     On May 28, 2017, at approximately 11:09 a.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "Plus all that 1000 a gram shit tell your man (Nix) neither one of you would be still in The game (drug trafficking) all would be rich as F (have a lot of money)."

51.     On May 28, 2017, at approximately 11:50 a.m., the **Target Cellular Device**, received a text message from telephone number (216) 548-7235, which read, "We had 5 (kilograms of heroin) only 1 (kilogram of heroin) left holdin 4 u."

52.     On May 28, 2017, at approximately 12:42 p.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "Ahki i sent a brick (kilogram of heroin) and 39 ($39,000 US currency) for real I do not play games with no one."

18

53.     On May 29, 2017, at approximately 11:44 a.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "Plus i need my money off that brick (kilogram of cocaine) i sent Yall have to straighten Yall hand (money owed)."

54.     On June 4, 2017, at approximately 10:27 p.m., the **Target Cellular Device**, sent a text message to telephone number (216) 548-7235, which read, "And unc (cocaine supplier) said you GOT your 39 grams (cocaine) when you claim it (kilogram of cocaine) was short (did not contain 1,000 grams) so stop playing it is what it is 61000 ($61,000 to purchase two kilograms of cocaine)."

55.     On June 20, 2017, at approximately 8:54 a.m., the **Target Cellular Device**, sent a text message from telephone number (216) 548-7235, which read, "On some real shit he (cocaine supplier) was about to give you the 10 (ten kilograms of cocaine) until that shit happened (Bedell sold them poor quality heroin) which made him salty (mad) when your guy (Nix) did not straighten his hand (pay back his drug debt)."

56.     On June 20, 2017, at approximately 8:58 a.m., the **Target Cellular Device**, received a text message from telephone number (216) 548-7235, which read, "Yeah dude (Nix) good peoples he will tighten yall up (pay back his drug debt) imma make sure of that well send sumtin (heroin) yall way but i got yall paper (money)."

57.     On June 23, 2017, at approximately 12:17 a.m., the **Target Cellular Device**, sent another text message from telephone number (216) 548-7235, which read, "The peoples (cocaine supplier) say its short (short supply) out the way (where the cocaine is originated) 16 tons (cocaine) got knocked (seized)."

58.     On June 26, 2017, at approximately 6:51 p.m., the **Target Cellular Device**, received another text message from telephone number (216) 548-7235, which read, "Aik y would

u send this (poor quality cocaine) up opened me up 4 unnecessary stuff up here (Cleveland, Ohio) imma switch mine (kilograms of cocaine) out with my dude shit (other cocaine supplier) wen sis (drug courier) come unless u swap me out (give me better quality kilograms of cocaine for the poor quality kilograms of cocaine)."

59.     On or about June 29, 2017, members of the Cleveland Division of the FBI subpoenaed account information for the Target Cellular Device through **Sprint. Sprint** reported the Target Cellular Device account was active and registered in the name of Jack Smith with a home address of 133 Anna Street, Dayton, Ohio.

60.     On June 29, 2017, United States Magistrate Judge David Ruiz, Northern District of Ohio, signed an order authorizing the use of a pen register and trap and trace and the acquisition of cell-site data on the cellular telephone number **Target Cellular Device**.  This pen register and trap and trace became operational on June 30, 2017, and continues through the present. Cell-site data obtained for the **Target Cellular Device** indicated that it was normally to be found in the Southern District of Ohio, greater Dayton area.

61.     Your Affiant knows that collecting location information on the Target Cellular Device for a 30 day period will assist investigators locate and identify the U.P. utilizing the Target Cellular Device to facilitate drug trafficking activities.   Additionally, collecting location information on the Target Cellular Device will assist investigators with identifying drug stash houses and other drug trafficking associates.

62.     In my training and experience, I have learned that **Sprint** is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911

Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

63.     Based on my training and experience, I know that **Sprint** can collect E-911 Phase II data about the location of the Target Cellular Device, by initiating a signal to determine the location of the Target Cellular Device on **Sprint's** network or with such other reference points as may be reasonably available.

64.      Based on my training and experience, I know that **Sprint** can collect cell-site data about the Target Cellular Device.

## AUTHORIZATION REQUEST

65.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

66.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified

because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

67.     I further request that the Court direct **Sprint** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **Sprint**. I also request that the Court direct **Sprint** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **Sprint's** services, including by initiating a signal to determine the location of the Target Cellular Device on **Sprint's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **Sprint** for reasonable expenses incurred in furnishing such facilities or assistance.

68.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

69.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Robert M. Buzzard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on_____, 2017.

_____
SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **207-289-4608,** (the **"Target Cellular Device"**), whose wireless service provider is **Sprint,** a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251.

2. Information about the location of the Target Cellular Device that is within the possession, custody, or control of **Sprint** including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B**

**Particular Things to be Seized**

All information about the location of the Target Cellular Device described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the Target Cellular Device" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **Sprint, Sprint** is required to disclose the Location Information to the government.  In addition, **Sprint** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **Sprint's** services, including by initiating a signal to determine the location of the Target Cellular Device on **Sprint's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate **Sprint** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).